## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

STEVEN PAUL CALLEJA, JR., #1134939,

        Petitioner,

v.                                      ACTION NO.  2:20cv9

HAROLD W. CLARK,
Director, Virginia Department of Corrections,

        Respondent.

### UNITED STATES MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

This matter is before the Court on Steven Paul Calleja, Jr.'s *pro se* petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, and the motion to dismiss filed by respondent Harold

W. Clarke, Director of the Virginia Department of Corrections ("respondent").  This matter was

referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C.

§ 636(b)(1)(B) and (C) and Rule 72 of the Local Civil Rules of the United States District Court

for the Eastern District of Virginia.  For the following reasons, the Court **RECOMMENDS** that

respondent's motion to dismiss, ECF No. 11, be **GRANTED,** and the petition, ECF No. 1, be

**DENIED** and **DISMISSED WITH PREJUDICE**.

### I.      STATEMENT OF THE CASE

In his *pro se* petition pursuant to 28 U.S.C. § 2254, petitioner Steven Paul Calleja, Jr.

("Calleja") alleges his federal rights were violated when he was convicted, following a jury trial

in the Circuit Court for Stafford County on October 13, 2016, of two counts of larceny with intent

to sell in violation of Virginia Code § 18.2-108.1.  ECF No. 1 at 1; *Commonwealth v. Calleja*, Nos. CR16000355-02, CR16000355-03 (Va. Cir. Ct. Oct. 13, 2016).  Calleja was sentenced to eight years in prison on January 19, 2017.  ECF No. 1 at 1.

The Court of Appeals of Virginia denied Calleja's appeal, and a three-judge panel refused Calleja's appeal on November 1, 2017.  *Calleja v. Commonwealth*, No. 0157-17-4 (Va. Ct. App. Nov. 1, 2017).  Calleja did not appeal the decision to the Supreme Court of Virginia.  ECF No. 1 at 2.

Calleja filed a *pro se* petition for a writ of habeas corpus in the Supreme Court of Virginia, which the court denied in a twenty-page order ("Order") on October 21, 2019.  *Calleja v. Clarke*, Record No. 181200, at 1879–98 (Va. Oct. 21, 2019).[1]  The Supreme Court of Virginia summarized the trial evidence as follows:

> The record, including the indictments and trial transcript, demonstrates several goats were stolen from the farms of Ronnie and Heidi Cross and John and Valerie Komrowski during the nighttime or early morning hours of January 15 and 16, 2016. On the morning of January 16, petitioner sent text messages to Kamin Belyamani inquiring if Belyamani's friend was interested in buying goats petitioner kept on his property.  The text messages included pictures of some of the stolen goats, although Belyamani did not know they were stolen at the time.  Belyamani had known petitioner for several months, had purchased animals from petitioner twice before, and had told petitioner a week or two earlier that he needed two sheep.  Belyamani knew from their conversations that petitioner "was going through a lot of stuff" and agreed to help petitioner sell the goats to Assapullah Yosufzai, the owner of a meat market.
>
> On January 17, petitioner and an unidentified companion brought several goats in a trailer hitched to the back of petitioner's truck to the meat market, where they met Yosufzai and Belyamani.  Yosufzai agreed to buy eight goats and two sheep from petitioner for $1,470.  Yosufzai bought all but the two largest goats petitioner presented him.  Later that evening, petitioner contacted Julian "Junior" Barrett, with whom petitioner had conducted prior transactions, and he offered Barrett the two remaining goats for $225 per goat.  Barrett said he was not interested, and petitioner responded

---

[1] Hereinafter, "R." refers to the record of Calleja's state habeas petition, *Calleja v. Clarke*, Record No. 1134939, received from the Supreme Court of Virginia on July 16, 2020.  The record consists of one thumb drive containing documents consecutively paginated from 1 through 1899.  "Order" refers to a subset of these pages, 1879 to 1898, containing the ruling of the Supreme Court of Virginia.

he "need[ed] some money" for farm supplies. Barrett said he would pay $225 for both goats, and petitioner agreed. Petitioner and his unidentified companion moved the two goats to Barrett's trailer.

On the night of January 19, Belyamani saw a news report about the theft of area goats, realized the goats petitioner sold to Yosufzai were stolen property, called the police, and turned over his phone containing the text message exchange with petitioner. Detective Robert Firkin went to Yosufzai's meat market early on the morning of January 20 and identified the goats Yosufzai purchased from petitioner as the same goats stolen from the Crosses' and the Komrowskis' farms. Furthermore, the sheep petitioner sold to Yosufzai had been stolen from a farm in a different county. A few days later, unaware of the theft of the goats and the resulting police investigation, Barrett brought the two goats he purchased from petitioner to a livestock exchange. John Komrowski's sister worked there and identified those goats as the Komrowskis' property, and Barrett turned them over to her. According to John Komrowski, the two large goats recovered from Barrett were worth $250 or $300 apiece based on their size and breed.

Based on the text messages Belyamani provided and a bill of sale Yosufzai produced, which listed petitioner as the seller on January 17, the police identified petitioner as a suspect in the theft of the goats. The police executed a search warrant for petitioner's residence on January 20 and seized petitioner's cell phone pursuant to the search warrant. Data retrieved from petitioner's cell phone included a January 16 text message to Billy Cissel ("Cissel"), petitioner's brother-in-law, stating "others I know are in big fields harder to catch." In a text message to Cissel sent on the morning of January 20, petitioner stated he had "a big big problem" because the person who bought the "big ones" intended to sell them at a livestock auction, and "if he does someone's going to know or the police will be there looking for him and then I'm going to get in trouble." Petitioner told Cissel "you might have to do something to avoid that from happening like either go in Messa pissed [sic] truck so he can get there or stealing back from him and sold to someone else."

At trial, Detective Firkin testified he and another detective interviewed petitioner at petitioner's home on January 20. Petitioner initially denied knowledge of the goats until Firkin told him he had been to Yosufzai's meat market and had seen the bill of sale bearing petitioner's name and signature. Petitioner then explained he was with his young son at a bank on the morning of January 17, when he encountered a man named "Julian," who had a trailer full of goats in the parking lot. Petitioner's son wanted to see the goats, they approached the trailer, and petitioner spoke with "Julian," who wanted to sell the goats. Petitioner agreed to buy the goats, and "Julian" took them to petitioner's residence and put them in a pen that morning. Petitioner did not provide Firkin with any contact information for "Julian." Petitioner said he contacted Belyamani because he knew Belyamani had a friend who wanted to buy goats, and he sold all but the two largest goats to Yosufzai at the meat market that afternoon. Petitioner further explained he was going to take the two largest goats home, but he stopped at a convenience store to get gas and encountered a man who inquired about the goats and agreed to buy them for $250. Petitioner did not identify this man or describe his vehicle or license plate number.

Firkin also testified petitioner's explanations contrasted with other information he obtained during the investigation. Whereas petitioner's cell phone contained text messages petitioner sent to Belyamani about the goats on the morning of January 16, petitioner claimed he bought the goats from "Julian" on the morning of January 17. Furthermore, Firkin interviewed Julian Barrett during the course of his investigation, and petitioner's description of the seller named "Julian" did not fit Barrett's appearance. On cross-examination, counsel asked Firkin if petitioner mentioned meeting two other men named "Timothy" and "Matthew." Firkin testified he did not believe petitioner provided any names other than "Julian," and had petitioner done so, those names would have appeared in the police reports.

Petitioner testified he encountered Timothy and Matthew outside the Bloom Store on the morning of January 15. Petitioner had known Matthew beforehand, but he did not know either man's last name or phone number. Timothy and Matthew had a pig and some goats in a livestock trailer hitched to a truck. Contrary to Belyamani's testimony that he contacted petitioner seeking to buy sheep, petitioner testified he inquired with Timothy and Matthew about the goats because Belyamani had expressed interest in buying goats. Timothy and Matthew said there was another buyer for the goats, but they would contact him if they had others to sell. During the afternoon of January 15, Timothy and Matthew came to petitioner's house, said they knew some farms that might be willing to "get rid" of goats, and agreed to meet at a particular location after 9:00 p.m. because Timothy had a date. Thereafter, Timothy and Matthew delivered several goats to petitioner, two or three goats at a time. Petitioner saw Timothy a few days later, after petitioner had learned some goats had been stolen from area farms. Petitioner asked if the goats he purchased had been stolen, and Timothy told him to "just keep your mouth shut about it or you'll have more to worry about than the police." Petitioner testified he did not mention Timothy and Matthew to Detective Firkin due to this threat.

Order at 2–4, R. at 1880–82 (alterations in original).

Calleja timely placed the pending federal petition for a writ of habeas corpus in the prison mailing system on December 20, 2019. ECF No. 1 at 16. In his grounds for relief, Calleja asserts he was denied effective assistance of counsel due to his counsel's failure to:

(1)     investigate forensic evidence that would have proven he was not at the scene of the crimes, and call witnesses, *id.* at 5–6, 21–38;

(2)     test the Commonwealth's theory of the case, *id.* at 6–9, 38–46;

(3)     document a plea agreement whereby Calleja waived his preliminary hearing in exchange for open file privileges and "a better deal down the road," *id.* at 9, 46–49;

(4)     file motions or make objections, including:

      (a)     move to set aside the verdict as inconsistent;

4

(b)     object to the Commonwealth's questioning of the victims;

(c)     object to the Commonwealth referring to Billy Cissel as a co-conspirator;

(d)     object to the Commonwealth's statement during closing argument, "four fingerprints on a gate; that's all we got"; and

(e)     move to strike at the close of the evidence due to insufficiency of the evidence, *id.* at 10–11, 49–63;

(5)   move for a mistrial due to the court's actions during Calleja's direct examination, *id.* at 12, 63–65; and

(6)   negotiate the same deal Calleja received on related charges in Spotsylvania County Circuit Court, or move to amend the charge to a misdemeanor, *id.* at 13, 65.

On May 20, 2020, respondent filed an answer to the petition, pursuant to Rule 5 of the Rules Governing Section 2254 Cases in the United States District Courts, and a motion to dismiss the petition, along with a supporting memorandum. ECF Nos. 11–13. Calleja filed a response to the motion to dismiss on June 11, 2020. ECF No. 17.

## II.    ANALYSIS

### A.    A deferential standard of review applies to claims adjudicated on the merits in state court.

When a claim has been properly exhausted and adjudicated on the merits in state court, this Court assesses the state court adjudication pursuant to 28 U.S.C. § 2254(d), rather than reviewing the merits of such a claim *de novo*. Section 2254(d) provides that a federal court may not grant relief on any claim that was adjudicated on its merits in state court, unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

5

A state court decision is "contrary to" clearly established federal law when a state court applies a rule different from the governing law articulated by the United States Supreme Court or arrives at a conclusion opposite that of the Supreme Court on materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404–06 (2000)). A state court decision constitutes an "unreasonable application" of federal law when the court identifies the correct governing legal principle from the decisions of the Supreme Court, but unreasonably applies that principle to the facts of the case. *Williams*, 529 U.S. at 413; *see Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that an unreasonable "application of clearly established law must be objectively unreasonable," rather than simply "incorrect or erroneous"). Stated differently, a "prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

"For a state court's factual determination to be unreasonable under [section] 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010) (citation omitted). Pursuant to this deferential standard of review, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Williams*, 529 U.S. at 389.

**B.**     *Strickland v. Washington* **provides the standard of review for ineffective assistance of counsel claims.**

The applicable standard for determining if counsel was ineffective is set forth in *Strickland v. Washington*, and requires a petitioner to show that his defense counsel provided assistance that (1) fell below an objective standard of reasonableness, and (2) prejudiced petitioner as a result.

466 U.S. 668, 687–700 (1984).  To establish that counsel's performance fell below an objective

standard of reasonableness, Calleja must show "that counsel made errors so serious that counsel

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at

687.  In doing so, Calleja must overcome the "'strong presumption' that counsel's strategy and

tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273

F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, Calleja must demonstrate that "there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694.  This requires Calleja to establish "probability sufficient

to undermine confidence in the outcome," rather than a mere showing that "the errors had some

conceivable effect on the outcome of the proceeding." *Id.* at 693–94.  A federal habeas court need

not address both cause and prejudice if the petitioner makes an insufficient showing on either one.

*Id.* at 697.

Because Calleja presents these claims in a section 2254 petition, he must show that the

state court's dismissal of his ineffective assistance of counsel claims was contrary to, or an

unreasonable application of, the *Strickland* standard, or was predicated upon an unreasonable

determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  To review a

claim of ineffective assistance of counsel, the Court must apply "a doubly deferential standard of

review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v.*

*Titlow*, 571 U.S. 12, 15 (2013) (citation and quotation marks omitted).

**C.**      **Calleja is not entitled to habeas relief on grounds 1 through 6, which were addressed**
         **on the merits by the Supreme Court of Virginia.**

The Supreme Court of Virginia's dismissal of Calleja's claims was not contrary to, or an

unreasonable application of, federal law, and was not predicated upon an unreasonable

determination of the facts in light of the evidence presented.  Therefore, for the reasons discussed below, grounds 1 through 6, which were addressed on the merits by the Supreme Court of Virginia, should be **DISMISSED**.

### 1.      Ground 1—Failure to Investigate

In ground 1, Calleja asserts counsel was ineffective due to his failure to:  (a) test certain forensic evidence that would have shown he was not at the scene of the crime; (b) obtain and enter into evidence a Bloom parking lot security video; and (c) interview or call certain witnesses (Gerrett Stevens, Jacob Mockabee, and Detective Bender).  ECF No. 1 at 5, 21–34; ECF No. 17 at 8–11.

#### a.      Forensic evidence

Calleja asserts that certain forensic evidence collected from the crime scenes could have exonerated him, specifically, fingerprints, boot prints, tire tracks, and hair fiber.  ECF No. 1 at 21–24.  Calleja references four fingerprints recovered from the gate at the Cross residence that were never tested, which counsel should have tested to uncover "the true perpetrators of the crimes." *Id.* at 21–22.  He next asserts that Animal Control Officer McCall testified that the same boot print was found at both residences, and that he took a casting of a boot print.  *Id.* at 22–23; ECF No. 17 at 10.  Calleja asserts counsel was ineffective for failing to compare Calleja's boots to the casting. ECF No. 1 at 22–23.  Next, Calleja asserts counsel was ineffective for failing to compare the photo of tire tracks "wi[th] hex[a]gonal detail" to the tires on Calleja's vehicles, and for failing to test a hair fiber recovered from one of the scenes to rule out that it was Calleja's.  *Id.* at 23–24.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis because he failed to "articulate which evidence should have been tested, proffer what information would have resulted from the

testing, or explain how this unspecified information would have affected the outcome of trial." Order at 13.

Calleja's counsel cross-examined Detective Firkin extensively about the physical evidence that was recovered and was not tested in any fashion, including: (1) four fingerprints recovered from the gate at the Cross residence, which were not even tested against the Cross family members, R. at 1233–36; (2) the cast of a boot print, R. at 1236–38; (3) purple fabric caught on the fence at the Cross residence, R. at 1238–39; (4) picture of tire tracks with a hexagonal design, R. at 1240–41; and (5) hair recovered from the Cross residence, R. at 1250. Counsel also cross-examined Detective Firkin about the execution of the search warrant at Calleja's residence, which specifically referenced Calleja's boots. R. at 1241–43. Detective Firkin testified that Calleja told them the location of the boots, but that the boots were never recovered. R. at 1242–43. During closing arguments, Calleja's counsel emphasized the physical evidence collected from the crime scenes that was never tested or linked to Calleja. R. at 1524–27, 1530–31, 1534, 1536. Thus, counsel effectively presented the jury with facts about the absence of forensic testing in support of an argument for reasonable doubt.

Additionally, showing that this forensic evidence did not match Calleja would not have necessarily proven Calleja's innocence. The evidence could have been left by someone not involved in the crime, or by someone assisting Calleja. The Commonwealth's theory of the case was that Calleja was not alone when the crimes were committed. R. at 1104 (Officer McCall observed more than one boot print at the Komrowski property); 1225 (Detective Firkin testified that "one individual probably was not solely responsible for the removing of these goats"); 1505–06 (Commonwealth argued in closing that Calleja was not alone that night). Therefore, assuming the physical evidence had been tested and did not further implicate Calleja, no reasonable

9

probability of a different trial outcome exists. Any such evidence would not have blunted the other evidence, including admissions by Calleja, showing that Calleja possessed and sold the stolen farm animals.

Moreover, Calleja admitted going to one of the crime scenes the night of the crimes. He testified that he followed Matthew and Timothy to what he thought was their house. R. at 1361–62. He testified that after "seeing all the evidence and stuff," he believed the house he followed them to "was the Green Acres street,"[2] and that he had not been to the Komrowski residence before. *Id.* On cross-examination, he clarified this testimony:

> Q   . . . And you're not sure where you went, but you're pretty sure based on looking at the pictures that it was the Green Acres address, so you admit that you were at the Green Acres address, correct?
> A   Yes.
> Q   You admit you got out of the truck?
> A   Yes.
> Q   You admit you went on the property?
> A   I was in the beginning of their driveway, yes.

R. at 1435–36. Accordingly, it would be futile for counsel to test forensic evidence to prove Calleja was not present at the Komrowski residence when he admitted being there.

### b.   Bloom store parking lot security footage

Calleja asserts counsel was ineffective for failing to investigate whether the Bloom store parking lot security video captured the license plate of the vehicle driven by Timothy and Matthew, and counsel was ineffective for failing to file a motion to preserve any video evidence. ECF No. 1 at 24, 54–57.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy the prejudice prong of the *Strickland* analysis, stating:

---

[2] During the trial, witnesses often referenced the Komrowski residence as the "Green Acres address." *See* R. at 1077, 1079, 1082, 1084, 1361–62, 1577.

Although petitioner asserts counsel's failure to investigate and obtain the Bloom Store's surveillance video forestalled an investigation of Timothy and Matthew, petitioner fails to demonstrate the reasonable probability of a different outcome at trial had counsel attempted to obtain the surveillance video. The claimed encounter with Timothy and Matthew occurred at the Bloom Store in January 2016, nine months before counsel noted petitioner's statement about the encounter in September 2016, and, contrary to petitioner's claim, counsel could not have learned about Timothy and Matthew from the police reports because petitioner did not mention these men during his interrogation, instead explaining he purchased the goats from a man known only as "Julian," about whom petitioner provided no information. Petitioner does not provide any information to suggest the surveillance video existed and had not been overwritten by the time he told counsel about the encounter at the Bloom Store nine months later. Likewise, petitioner's suggestion that the video, if it existed, would have provided useful information rests on pure speculation. Petitioner fails to articulate any basis that would support his claim that the video would have captured a clear view of the license plate of the truck Timothy and Matthew used to arrive at the Bloom Store, nor has he proffered any information which would support the conclusion that either man owned the truck or could be found through its license plate number.

Order at 4–5.

Calleja asserts Detective Firkin told counsel two days following Calleja's arrest about the transaction in the Bloom store parking lot with Timothy and Matthew. ECF No. 1 at 35; R. at 7–8. Calleja does not assert that Detective Firkin notified counsel that a security camera may have caught the transaction. According to Calleja's representation in his state habeas petition, Calleja told counsel on September 28, 2016, that there may be video footage of the Bloom parking lot. R. at 7–8. As the Supreme Court of Virginia noted, this was nine months after the January meeting. Order at 4. Calleja has presented no evidence that there is a security camera in the Bloom parking lot, that the camera caught any of the transaction Calleja asserts transpired, or that such footage would have still been available after counsel was notified of its potential existence. *See Formica v. Superintendent of Cent. Va. Reg'l Jail*, No. 7:14cv357, 2015 WL 5561933, at *13 (W.D. Va. Aug. 21, 2015) (finding unsupported and speculative allegations of ineffective assistance of counsel were not substantial), *report and recommendation adopted,* No. 7:14cv357, 2015 WL

11

5561952 (W.D. Va. Sept. 21, 2015); *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir. 2006) (upholding district court's dismissal of petition and finding "conclusory, speculative allegations" cannot support a claim for habeas relief). Accordingly, Calleja has failed to show the Supreme Court of Virginia erred in finding Calleja was not prejudiced by counsel's actions.

### c. Potential witnesses

Next, Calleja asserts his counsel was ineffective for failing to call Gerrett Stevens, Jacob Mockabee, and Detective Bender to testify. ECF No. 1 at 24–29, 36–37; ECF No. 17 at 8–11.

Calleja asserts Stevens could have testified to the following: (1) Calleja was making $1,000.00 per week working for Stevens' father and was not in need of money as alluded to by Belyamani; (2) Calleja had physical limitations that would make it difficult to move animals; and (3) Belyamani was pressuring Calleja to find him goats. ECF No. 1 at 25–26.

Calleja raised this claim with respect to Stevens in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy the prejudice prong of the *Strickland* analysis, stating:

> Assuming without deciding Stevens was present in the courthouse, petitioner fails to demonstrate there is a reasonable probability the outcome of trial would have been different had counsel called him to testify. To the extent petitioner asserts Stevens would have testified that he overheard Belyamani ask[] petitioner whether petitioner had any animals to sell, petitioner fails to proffer a legal ground for admitting this hearsay testimony. *See* Rule 2:801(c) (hearsay is an out of court statement offered to prove the truth of the matter asserted). Moreover, such testimony would have had minimal impact because Belyamani acknowledged telling petitioner he wanted to buy sheep. To the extent petitioner proffers Stevens would have testified about petitioner's physical limitations, the record, including the trial transcript and the defense's trial exhibits 15, 15A, and 16, demonstrates petitioner and Cissel also testified about those limitations, and petitioner's medical records were admitted at trial, showing petitioner fractured his right ankle and left femur in 2008 and continued to complain about pain. Stevens' testimony on that subject therefore would have been cumulative. *See Huffington* v. *Nuth,* 140 F.3d 572, 581 (4th Cir. 1998) (counsel's failure to admit cumulative evidence does not demonstrate prejudice).

Order at 8–9.

First, Calleja has provided no affidavit from Stevens. "A reviewing court should view a claim of ineffective assistance of counsel based on a failure to subpoena witnesses with 'great caution' where, as here, the petitioner does not provide the court with any affidavits from the potential witnesses." *Cross v. United States*, No. 2:06cv457, 2007 WL 128964, at *10 (E.D. Va. Jan. 12, 2007); *see also Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001) ("Where the only evidence of a missing witness[]' testimony is from the defendant, this Court views claims of ineffective assistance with great caution." (citation omitted)). Second, as discussed by the Supreme Court of Virginia, Stevens' proposed testimony would have been minimally helpful and cumulative. Order at 8–9; *see also* R. at 1339 (Calleja testified that he had just finished a job for Stevens and had gotten paid); R. at 1315–18, 1402–15 (Cissel and Calleja testified about Calleja's medical impairments and physical limitations); R. at 516–46 (Calleja's medical records were entered into evidence); R. at 1350, 1441 (Calleja testified that Belyamani wanted sheep and had a friend who wanted goats); R. at 1118 (Belyamani testified that he told Calleja he needed sheep).

Calleja asserts Jason Mockabee could have testified he helped Calleja sell the goats to Belyamani and Yosufzai by helping Calleja unload the goats, and that he witnessed Calleja give Belyamani $50.00. ECF No. 1 at 27–29; ECF No. 17 at 8–9. Calleja proffers Mockabee's affidavit, which states Mockabee accompanied petitioner when petitioner delivered the goats to Yosufzai and Barrett on January 17, and that Mockabee handled the animals due to Calleja's injuries. ECF No. 1-1 at 9–13. This information, Calleja argues, could have been used to refute the Commonwealth's assertion that Billy Cissel helped Calleja, ECF No. 1 at 37–38, as well as Belyamani's testimony that Calleja helped take the goats out of the trailer, ECF No. 17 at 11.

13

Calleja raised this claim with respect to Mockabee in his state habeas petition, and the

Supreme Court of Virginia found he failed to satisfy the prejudice prong of the *Strickland* analysis,

stating:

> The record, including the trial transcript, demonstrates neither Yosufzai nor
> Belyamani identified the person who went with petitioner to the meat market on
> January 17, and Barrett did not know the name of the person who accompanied
> petitioner to Barrett's property on the same date. Although the Commonwealth
> suggested, based on the text messages exchanged between Cissel and petitioner,
> that Cissel aided petitioner with the larceny of the goats, which occurred late on the
> night of January 15 or during the early morning hours of January 16, the
> Commonwealth presented no evidence or argument it was Cissel who traveled with
> petitioner to deliver the goats to Yosufzai and Barrett on January 17. Petitioner
> testified Mockabee accompanied him on January 17, and this testimony was
> unrebutted. Mockabee's testimony to the same effect would have been cumulative
> of petitioner's testimony. Moreover, Mockabee's testimony would not have shed
> light on petitioner's actions during the timeframe when the goats were stolen.

Order at 9.

As with Stevens, any testimony Mockabee could provide about Calleja's physical

condition would be cumulative. Further, Mockabee's testimony that he helped Calleja deliver

goats on January 17 would not contradict the evidence presented at trial, would not refute the

evidence tending to show Cissel helped steal the goats on the night of January 15 or the early

morning of January 16, and would not explain Calleja's whereabouts the evening the goats were

stolen. Calleja has failed to show counsel was ineffective for failing to call Stevens or Mockabee,

or that their testimony gives rise to a reasonable probability of a different outcome at trial.

Lastly, Calleja asserts Detective Bender could have testified that Calleja's boots did not

match the casting taken by Officer McCall. ECF No. 1 at 24–25. In his state habeas petition,

Calleja failed to raise the claim that counsel was ineffective for failing to call Detective Bender.

The facts before the Court indicate that the argument is without merit, and the Court will address

this procedurally defaulted claim on the merits. *See Bacon v. Lee*, 225 F.3d 470, 477 (4th Cir.

2000) (holding the court may address the merits of a claim that may be procedurally defaulted, if it ultimately finds the claim meritless). Calleja does not provide an affidavit from Detective Bender, and it is pure speculation that Detective Bender would have testified that Calleja's boots were recovered and did not match the casting taken by McCall. Such testimony would directly contradict the testimony of Detective Firkin, who worked with Detective Bender on the case, that Calleja's boots were not recovered. R. at 1192–93, 1238, 1241–43. Further, even had counsel shown the casting did not match Calleja's boots, such evidence would not exonerate Calleja as the Commonwealth's contention throughout the trial was that Calleja did not act alone. *See* discussion *supra* Section II(C)(1)(a) (citing R. at 1104, 1225, 1505–06). Accordingly, Calleja has failed to show a reasonable probability that the outcome of the trial would have been different if counsel called Detective Bender as a witness.

### 2. Ground 2—Failure to Test the Commonwealth's Theory of the Case

In ground 2, Calleja asserts his counsel was ineffective for failing to test the Commonwealth's theory of the case by using GPS data to show his location at the time of the crimes, and using his cellphone call log to show repeated calls from Belyamani. ECF No. 1 at 6, 38–46; ECF No. 17 at 19, 26.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis. Order at 10–11. With respect to Calleja's argument regarding counsel's failure to use the GPS data, the Supreme Court of Virginia stated:

> The record, including the trial transcript and the GPS charts attached to counsel's post-trial letter to petitioner, demonstrates the Commonwealth provided the defense a series of charts showing the location of the towers with which petitioner's cell phone was communicating on January 16, 2016, at 12:41 a.m., 1:01 a.m., 1:03 a.m., 1:11 a.m., 1:41 a.m., 2:02 a.m., 2:11 a.m., 2:40 a.m., 2:57 a.m., 4:10 a.m., and 4:40 a.m. Nothing within the charts purports to show petitioner's precise location at

those times; rather, the charts appear to show petitioner's cell phone was within, or was communicating with various cell phone towers within, the general vicinity of the victims' farms around the time the larcenies were committed. Counsel could reasonably have determined such evidence would not be helpful to petitioner's case. Moreover, notwithstanding petitioner's reliance on the GPS charts, petitioner testified he parked at the Komrowskis' property near or after midnight on January 15 or January 16, although petitioner claimed he followed Timothy and Matthew there and did not know the property belonged to a victim of the larcenies. Petitioner therefore admitted being at the Komrowskis' property around the time their goats were stolen.

Order at 11.

Calleja attached several GPS map printouts to his petition, with the location of the crime scenes and the location of his mother's house drawn on the maps. ECF No. 1-2 at 1–11. The maps appear to show that Calleja accessed cell towers within range of the crime scenes and his mother's house on multiple occasions between 12:41 a.m. and 4:40 a.m. on January 16. *Id.* Calleja asserts the GPS printouts show that he was at his mother's house when these calls were made. ECF No. 1 at 40–41.

Calleja testified that, after initially meeting Timothy and Matthew at 9:30 p.m. on the night the goats were stolen, he made three additional trips to pick up goats from Timothy and Matthew and drop them off at his home. R. at 1424–37. During this time, Calleja testified he drove between his home, his mother's home, and several different meeting places, including the Komrowski property and a meeting place one block from his mother's home. *Id.* He testified that, after crashing on his mom's couch for "a little bit," he returned to his home Saturday morning at "probably four, five in the morning." R. at 1436–37. Accordingly, he has failed to explain how the GPS evidence could have been used by counsel to prove he was at his mother's house at the time of the crimes, or how counsel was ineffective for not introducing such evidence.

16

With respect to Calleja's argument regarding counsel's failure to use his cellphone call log to show "Belyamani was pressuring Petitioner to find him sheep and goats," ECF No. 1 at 43, the Supreme Court of Virginia stated:

> The record, including the trial transcript and the Commonwealth's trial exhibit 11, demonstrates Belyamani repeatedly acknowledged calling petitioner before the transaction with Yosufzai, explaining he called petitioner to arrange to buy some sheep. Belyamani also acknowledged speaking with petitioner during the period of time between requesting the sheep and arranging for petitioner to meet with Yosufzai about the goats, including late on the night of January 15. Belyamani testified, "I called him like if you look at the record a couple times." Belyamani therefore never denied calling petitioner.
>
> In addition, the court admitted an "extraction report" logging the incoming and outgoing phone calls petitioner's cell phone registered between January 9 and January 20, 2016. It showed petitioner's cell phone received one incoming call from Belyamani's cell phone number on each day from January 11 through January 14, another incoming call from Belyamani's cell phone number during the early evening of January 15, and several incoming calls from Belyamani's cell phone number during the early morning hours of January 16. Referring to the extraction report during the closing argument of the guilt phase of the trial, counsel asserted the "phone records" showed Belyamani called petitioner "a lot" and "did most of the calling." Petitioner fails to articulate what further actions counsel should have taken to emphasize that Belyamani had been calling petitioner during the period reflected in petitioner's call log, and he fails to demonstrate a reasonable probability that taking those unspecified actions would have produced a different outcome at trial.

Order at 10–11.

In his federal petition, Calleja argues that the call log discredits Detective Firkin and Belyamani, and refutes the theory that Calleja was desperate to sell the goats. ECF No. 1 at 44. Calleja argues the call log discredits Detective Firkin's testimony that, "[t]he first call I noted in that time frame between Steven and Kamim [Belyamani] was very late the 15th of January." *Id.* at 43; *see also* R. at 1217. Calleja has taken Detective Firkin's testimony out of context. He did not testify that the call on January 15 was the first call between Calleja and Belyamani. He was asked whether he saw "a call history between Kamim and Steven *for January 16th*?" R. at 1217

17

(emphasis added). His response was, "[t]he first call I noted *in that time frame* between Steven and Kamim [Belyamani] was very late the 15th of January." *Id.* (emphasis added). Accordingly, a call log reflecting calls to Calleja from Belyamani prior to January 15 does not discredit Detective Firkin's testimony.

Next, Calleja argues the call log shows "Belyamani[] lied when he stated he wasn't looking for goats," indicates Belyamani was "pressuring [Calleja] to find him sheep and goats," and refutes the theory that Calleja was "in a hurry to sell the goats." ECF No. 1 at 43. Calleja references the following direct examination of Belyamani:

> Q.     So you had told him you were looking for sheep?
>
> A.     Yeah, yeah, personally two sheep, yeah.
>
> Q.     Were you looking for goats for yourself?
>
> A.     No, not—so, when, you know, I know him because it's like when we was talking about his situation, what he's going through about the goat I tried to help him to sell the goat.

R. at 1119.

Although the call log reflects multiple calls from Belyamani to Calleja, it does not contradict Belyamani's testimony that he was not looking for the goats for himself, does not show that Belyamani was pressuring Calleja, and does not show that Calleja was in no hurry to sell the goats. R. at 508–15. Calleja's counsel pointed out during closing argument that Belyamani "called him a lot" and "did most of the calling," explaining "it is reasonable to believe that this is why [Calleja] was going to purchase goats was because there was a demand for them and the demand was from someone he knew." R. at 1560. It is unclear what further purpose the call log could have served, and Calleja has not shown that had counsel utilized the call log in a different manner, there is a reasonable probability of a changed outcome at trial.

18

### 3.      Ground 3—Failure to Document Plea Agreement

In ground 3, Calleja asserts his counsel was ineffective due to his failure to document an

agreement whereby Calleja agreed to waive his preliminary hearing in exchange for "open file

privil[e]ges and a better deal down the road." ECF No. 1 at 9, 46–49.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia

found he failed to satisfy the prejudice prong of the *Strickland* analysis, stating:

> The record, including the indictments, the trial transcript, petitioner's post-trial
> letter to the court, and the conviction and sentencing orders, demonstrates petitioner
> was charged with six felonies carrying, in the aggregate, a maximum of ninety
> years' imprisonment. Code §§ 18.2-91, -97, and -108.01; *see also* Code § 18.2-10.
> Petitioner was convicted of two counts of larceny with intent to sell, each carrying
> a range of two to twenty years' imprisonment, Code § 18.2-108.1, and the jury fixed
> petitioner's sentence at a total of eight years. In a letter to the trial judge in advance
> of sentencing, petitioner stated that, shortly before trial, the prosecutor "asked what
> kind of plea deal I would accept." Counsel informed petitioner that the prosecutor
> would not be "happy" unless petitioner served "at least two years." However,
> petitioner's letter continued, "If I took the two years, I would end up losing my
> house, property and custody of my son, so an agreement was not reached." At
> sentencing, the court imposed the eight-year sentence.
>
>    Petitioner fails to demonstrate there is a reasonable probability that, but for
> counsel's failure to document the agreement to waive the preliminary hearing, the
> parties would have reached an agreement that would have been presented to and
> accepted by the court, and the resulting conviction or sentence would have been
> less severe than the judgment actually imposed. *Cf. Lafler v. Cooper*, 566 U.S. 156,
> 164 (2012) (applying the prejudice prong in the context of a "favorable plea"
> rejected on the advice of counsel in a case that ended in a jury trial in which the
> defendant "received a sentence harsher than that offered in the rejected plea
> bargain"); *Missouri v. Frye,* 566 U.S. 134, 138 (2012) (addressing the prejudice
> prong in the "context of claimed ineffective assistance that led to the lapse of a
> prosecution offer of a plea bargain, a proposal that offered terms more lenient than
> the terms of the guilty plea entered later"). Under the agreement to waive the
> preliminary hearing, as described in the petition for a writ of habeas corpus, the
> prosecutor agreed to engage in plea negotiations and offer "a better plea bargain"
> before trial. The prosecutor did not agree to any particular disposition, including
> reducing the felony charges to misdemeanors. Regardless of counsel's failure to
> document the agreement to waive the preliminary hearing, petitioner's post-trial
> letter to the court shows the prosecutor fulfilled her promise to engage in plea
> negotiations and indicated she would not consider an agreement that included an

active sentence of less than two years, but petitioner was not inclined to accept such an offer due to financial and family concerns.

Order at 6–7.

Calleja argues that he waived his preliminary hearing thinking he would receive something—"open file privil[e]ges and a better deal down the road"—"but instead received nothing." ECF No. 1 at 47. Calleja acknowledges counsel was given "open-file priv[i]lege," and that plea discussions took place. *See id.*; ECF No. 1-3 at 4, 6. According to Calleja's letter to the state court, the Commonwealth was willing to make a plea offer, but insisted that Calleja serve at least two years in prison. ECF No. 1-3 at 4, 6. Calleja rejected this condition. *Id.* Calleja asserts he "wanted the same deal in this case" as he received in the Spotsylvania Circuit Court, a one-year sentence with all but ten days suspended. ECF No. 1 at 47; ECF No. 1-3 at 5. Calleja has not shown that, had counsel documented the agreement made when Calleja waived his preliminary hearing, there is a reasonable probability that Calleja and the Commonwealth would have reached a plea agreeable to both sides.

### 4.    Ground 4—Failure to File Motions or Make Objections

In ground 4, Calleja asserts his counsel was ineffective due to his failure to (a) move to set aside the verdict as inconsistent; (b) object to the Commonwealth stating Calleja had admitted to being at one of the residences where the crimes took place; (c) object to the Commonwealth referring to Billy Cissel as a co-conspirator; (d) object to the Commonwealth's statement during closing argument, "four fingerprints on a gate; that's all we got"; and (e) move to strike at the close of the evidence due to insufficiency of the evidence. ECF No. 1 at 10, 49–63; ECF No. 17 at 4–6, 20.[3]

---

[3] Calleja also includes in this section his argument that counsel was ineffective for failing to move to preserve evidence, specifically video footage from the Bloom store parking lot, and failure to

### a.     Motion to set aside the verdict as inconsistent

The jury found Calleja not guilty of two counts of burglary and two counts of grand larceny, but found him guilty of two counts of larceny with intent to sell. R. at 253–55. Calleja asserts his counsel was ineffective for failing to move to set aside the verdict as inconsistent. ECF No. 1 at 49–50.

Calleja did not raise this ineffective assistance of counsel claim in his state habeas petition, rather he argued the jury verdict should be overturned as inconsistent, and the Supreme Court of Virginia found "this non-jurisdictional issue could have been raised at trial and on direct appeal and, thus, is not cognizable in a petition for a writ of habeas corpus." Order at 18 (citing *Slayton v. Parrigan*, 215 Va. 27, 29 (1974)).

The facts before the Court indicate that this procedurally defaulted claim is without merit, and the Court will address the claim on the merits. *See Bacon*, 225 F.3d at 477 (holding the court may address the merits of a claim that may be procedurally defaulted, if it ultimately finds the claim meritless). Under Virginia law, inconsistent jury verdicts as to separate offenses are valid. *See McQuinn v. Commonwealth*, 839 S.E.2d 907, 910–11 (Va. 2020) (upholding convictions for use of a firearm during the commission of felonies where the defendant was found not guilty of the underlying felonies). Citing the United States Supreme Court, the Supreme Court of Virginia has recently held that inconsistent verdicts are not grounds for reversal.

> Because the jury (i) may have erred in failing to convict the defendant of the predicate offense while finding him guilty of the compound offense, *or* (ii) may have made a mistake in finding the defendant guilty of the compound offense while finding him not guilty of the predicate offense, *or* (iii) may have "simply decided to be lenient with the defendant" by convicting him only of the compound offense, "[i]nconsistent verdicts . . . present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is

---

move for tests of the forensic evidence. ECF No. 1 at 55–57. These arguments were addressed in Section II(C)(1) above.

> unclear whose ox has been gored. Given this uncertainty, and the fact that the
> Commonwealth is precluded from challenging the acquittal, it is hardly satisfactory
> to allow the defendant to receive a new trial on the conviction as a matter of course."

*Id.* (quoting *United States v. Powell*, 469 U.S. 57, 65 (1984)).

Accordingly, it was not ineffective for counsel to decide not to raise the issue of inconsistent verdicts at trial or on appeal. *See Herrington v. Clarke*, No. 1:16cv412, 2020 WL 5809994, at *15 (E.D. Va. Sept. 29, 2020) (dismissing ineffective assistance of counsel claim premised on counsel's failure to raise an inconsistent judgment argument on appeal).

### b.   Object to the Commonwealth's questioning of the victims

In his federal petition, Calleja asserts his counsel was ineffective due to his failure to object to the Commonwealth's asking the victims if they had invited Calleja onto their property, or given Calleja permission to take their property. ECF No. 1 at 51. Calleja argues counsel should have pointed out that the Commonwealth had not established these elements of the crime. *Id.*

The Supreme Court of Virginia found this claim failed to satisfy either prong of the *Strickland* test, stating

> Counsel could reasonably have determined the question appropriately related to the
> "trespassory taking" element of larceny and any objection would have been futile.
> *See Carter v. Commonwealth*, 280 Va. 100, 105 (2010) (a violation of an owner's
> possessory right constitutes a trespassory taking); *see also [Correll v.
> Commonwealth*, 232 Va. 454, 470 (1987)] (counsel is not required to make a futile
> objection).

Order at 14–15.

Even if there were a valid basis upon which counsel could have objected, counsel's "failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under *Strickland*," *Humphries v. Ozmint*, 397 F.3d 206, 234 (4th Cir. 2005), which is "virtually unchallengable," *Strickland*, 466 U.S. at 690–91. Moreover, Calleja has

22

failed to show a reasonable probability that the outcome of his trial would have been different had counsel objected to the Commonwealth's questions.

###         c.        Object to the Commonwealth referring to Billy Cissel as
###                   a co-conspirator

Calleja asserts his counsel was ineffective for failing to object to the Commonwealth referring to Cissel as Calleja's "co-conspirator," and for failing to call Cissel's "alibi" witness to testify regarding where Cissel was the night the goats were stolen. ECF No. 1 at 51–53.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis, stating:

> The record, including the trial transcript, demonstrates Cissel testified he spent the night of January 15, 2016 at a friend's house. On the morning of January 16, Cissel sent petitioner a text message asking what "the guy" said. Cissel explained the text message referred to a man who had hired petitioner and Cissel for a home maintenance job. Later in the day, petitioner sent Cissel a text message stating "others I know are in big fields harder to catch." Petitioner then asked Cissel if he was "going again tonight," which Cissel testified he believed was a reference to hunting, and Cissel said no. On January 20, petitioner sent Cissel a text message explaining he had a "big problem" because the man who bought the "big ones" was going to an auction and they might need to "steal[] back from him." The police interviewed Cissel a couple of weeks later, and Cissel denied stealing goats and was not arrested or charged.

> During closing argument of the guilt phase, the prosecutor asserted stealing the goats was "no small operation" and petitioner did not act alone. The prosecutor noted Cissel sent the text message on the morning of January 16 asking what "the guy" said fifteen minutes after petitioner sent Belyamani a text message inquiring if there was a buyer for the goats, and the prosecutor asserted Cissel's explanation of what he meant in that text message was unreasonable. In light of the text activity between petitioner and Cissel, the prosecutor suggested "this was not a fly-by-night operation" and "was something that had been going on between" petitioner and Cissel.

> Counsel could reasonably have determined the prosecutor's argument was based on the evidence at trial. *See Elliott* v. *Warden of the Sussex I State Prison*, 274 Va. 598, 618 (2007) (rejecting an ineffective assistance challenge where the prosecutor's argument "was a proper comment based upon the evidence"). Counsel could therefore reasonably have determined any objection would have been futile. *See Correll*, 232 Va. at 469–70.

Order at 15–16 (alteration in original).

The Commonwealth argued that Calleja had help the night of the theft. R. at 1505–06. The Commonwealth further suggested Cissel was the person assisting Calleja based on the text messages exchanged between Calleja and Cissel, the statements Cissel gave police when questioned, and the text message Calleja's wife sent to Calleja asking if Calleja was the "goat napper" and if that was what Calleja and Cissel were doing in Stafford County. R. at 454–56, 1512–13, 1515–16, 1518–19, 1573–76.[4]  Relying upon evidence presented at trial, the Commonwealth's suggestion that Cissel helped Calleja take the goats was not so clearly prejudicial that defense counsel should have objected. *See Seay v. Commonwealth*, 115 S.E. 574, 575–76 (1923) ("Courts ought not to reverse cases because counsel, in the heat of argument, sometimes wander a little way outside the record." (quotation marks and citation omitted).  Furthermore, courts have found that, "[b]ecause many lawyers refrain from objecting during opening and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993)).

With respect to Calleja's argument that counsel should have called Mr. Tucker to establish Cissel's "alibi" for the night of the crimes, the Supreme Court of Virginia found Calleja failed to establish either prong of *Strickland*, stating:

> An alibi is a defense "based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant

---

[4] Nowhere in the Commonwealth's closing argument or rebuttal argument does counsel use the term "co-conspirator" as suggested by Calleja.  R. at 1495–1521, 1570–81; *see* ECF No. 1 at 51 ("[m]y attorney failed to object [when] the prosecutor 'kept saying' Cissel was Petitioner's 'co-conspirator.'").

time." *Cooper* v. *Commonwealth*, 277 Va. 377, 384 (2009) (quotation and citation omitted). Cissel was not a defendant at petitioner's trial, and, therefore, counsel could reasonably have determined attempting to introduce an alibi witness on Cissel's behalf would have been futile. *See Correll*, 232 Va. at 469–70. Moreover, the record, including the trial transcript, demonstrates Cissel testified he was at his friend Andrew's house on the night of January 15, stayed there all night, and did not see petitioner again until the next day. Counsel therefore presented evidence of Cissel's location during the period of time the thefts took place.

Order at 16.

Calleja has not attached an affidavit from Mr. Tucker, who Calleja describes as "an upstanding citizen in the community." ECF No. 1 at 53. Further, Cissel testified that, on January 15, he stayed all night at his "friend Andrew's house." R. at 1296–97. Accordingly, counsel presented evidence of Cissel's location the night of the thefts. Further testimony would have been cumulative, and Calleja has failed to show a reasonable probability of a different trial outcome if Mr. Tucker had been called to testify.

### d.   Object to the Commonwealth's statement during closing argument, "four fingerprints on a gate; that's all we got"

Calleja asserts that counsel's comment "four fingerprints on a gate; that's all we got," insinuates the fingerprints tie Calleja to the crime scene. ECF No. 1 at 53. Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis, stating:

> The record, including the trial transcript, demonstrates four fingerprints were recovered from the Crosses' gate but were not tested. During closing argument of the guilt phase, counsel asserted there was reasonable doubt as to petitioner's guilt because the police failed to determine who contributed the fingerprints. On rebuttal, the prosecutor stated, "Four fingerprints on a big gate, that's all we got, I mean, do we really expect four fingers only touched a gate one time, probably not." Counsel could reasonably have determined the prosecutor's statement was based on the evidence at trial and appropriately contested a point raised in counsel's closing argument. *See* [*Elliott v. Warden of the Sussex I State Prison*, 274 Va. 613, 618 (2007)]; *see also Clozza v. Commonwealth*, 228 Va. 124, 137 (1984) ("In rebuttal argument, a prosecutor has the right to answer the argument made by defense counsel and to refer to evidence and fair inferences suggested by the

evidence touching the subjects covered by the adversary."). Counsel could therefore reasonably have determined any objection would have been futile. *See Correll*, 232 Va. at 469–70.

Order at 16–17.

During closing argument, defense counsel argued at length regarding Detective Firkin's failure to test the physical evidence gathered following the crimes. R. at 1524–27, 1530–31, 1534, 1536, 1569. In rebuttal, the Commonwealth argued that Detective Firkin did not get the case until several days after the crimes occurred, and

> [s]econdly, a hair recovered from a pen where there are goats, I don't know the evidentiary value of that. Four fingerprints on a big gate, that's all we got, I mean, do we really expect four fingers only touched a gate one time, probably not.

R. at 1571. When read in context, the Commonwealth's statement does not insinuate that these fingerprints matched Calleja. The entire argument revolved around the failure to test the physical evidence including the fingerprints. Detective Firkin testified that prints were not even obtained from the Cross residents to rule out that they left the prints. Calleja has not established a basis for objecting to the Commonwealth's statement about four fingerprints on the gate, and has not shown a reasonable probability of a different trial outcome had counsel objected.

### e.   Move to strike at the close of the Commonwealth's case due to insufficiency of the evidence

Calleja argues counsel should have moved to strike at the close of the Commonwealth's case due to insufficiency of the evidence. ECF No. 1 at 57–62. Calleja asserts he did not know the goats were stolen until after he sold them; that he told the police what happened, but did not give Timothy and Matthew's names due to threats he received from them; and, that he was able to sell the large goats for less than they were worth because he had already doubled his money on the sale of the smaller goats. *Id.*

26

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia

found he failed to satisfy either prong of the *Strickland* analysis, stating:

> The record, including the trial transcript, demonstrates petitioner possessed recently
> stolen goats, which the court instructed the jury was a circumstance from which it
> could infer petitioner was the thief. *See Burton* v. *Commonwealth*, 58 Va. App.
> 274, 284 (2011) (possession of recently stolen goods permits an inference of
> larceny by the possessor). Moreover, petitioner provided contradictory and
> incredible explanations for how he acquired the goats, sent inculpatory text
> messages to Cissel, and promptly sold the goats, including the largest goats, which
> he sold for half the price petitioner initially sought and significantly less than John
> Komrowski testified they were worth. Under the circumstances, counsel could
> reasonably have determined this was an issue of fact for the jury and a motion to
> strike the charges of larceny with intent to sell would have been futile. *See Correll*
> v. *Commonwealth*, 232 Va. 454, 470 (1987) (counsel is not required to make a futile
> objection). Moreover, petitioner fails to demonstrate a reasonable probability that
> the trial court or the Court of Appeals would have held the evidence supporting
> those charges was insufficient as a matter of law.

Order at 13–14.

At the close of the Commonwealth's case, counsel moved to strike the charge of breaking

and entering at the Cross residence on the basis that the barn was not permanently affixed to realty.

R. at 1259–69. The motion was denied. R. at 1274–75. The motion was renewed at the close of

the case, in addition to an argument that the breaking and entering count with respect to the

Komrowski residence should also be struck. R. at 1475–82. The motions were denied. R. at 1485.

Counsel's decision to argue that the Court should strike the breaking and entering counts

due to the Commonwealth's failure to prove the barns were permanently affixed to realty, was a

reasonable tactical decision. Given the evidence against Calleja as outlined by the Supreme Court

of Virginia, Calleja has failed to show that counsel's decision to focus his motions to strike on the

weaker aspects of the Commonwealth's case fell below an objective standard of reasonableness.

### 5. Ground 5—Failure to Move for Mistrial

In ground 5, Calleja asserts his counsel was ineffective when he failed to move for a

27

mistrial when the trial judge allegedly rolled his eyes during Calleja's direct examination. ECF No. 1 at 12, 63–64; ECF No. 17 at 27–28. Calleja provides two affidavits of individuals who observed the trial judge rolling his eyes and appearing uninterested in Calleja's testimony. ECF No. 1-1 at 16–17.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis, stating:

> The record, including the trial transcript and counsel's post-trial notes, demonstrates counsel commented during petitioner's direct examination that "it appears that presenting my case is causing an issue" and referred to "the rolling of eyes." The judge said, "I'm afraid I don't know what you're talking about," and counsel responded the prosecutor did. The judge replied, "Well, all I can tell you is I haven't observed anything, of course, I've been watching the witness and the jurors, not necessarily counsel, but just proceed with your questioning." Counsel then continued with petitioner's examination. Counsel's post-trial notes state the judge appeared to be asleep, not rolling his eyes, during petitioner's direct examination. In an effort to rouse the judge without challenging him directly, counsel drew the judge's attention to the prosecutor who had been "roll[ing] her eyes." The judge was "more attentive" afterward.
>
> Whether to seek a mistrial is a tactical decision entrusted to counsel, *United States v. Burke*, 257 F.3d 1321, 1324 (11th Cir. 2001); *United States v. Washington*, 198 F.3d 721, 723 (8th Cir. 1999), and counsel could have reasonably decided seeking a mistrial based on the assertion the judge's conduct prejudiced the jury would not have been helpful or successful. Counsel's post-trial notes provide no ground to move for a mistrial based on the judge rolling his eyes, an action counsel attributed to the prosecutor, and counsel could have reasonably determined acting indirectly was preferable to accusing the judge of falling asleep. Moreover, regardless whether the judge allegedly rolled his eyes or fell asleep, the situation improved after counsel interrupted petitioner's direct examination to address the issue. Petitioner's assertion the judge would have granted a mistrial, had counsel moved for one, is pure speculation.

Order at 17–18 (alteration in original).

Counsel's notes do not indicate the trial judge rolled his eyes, rather that he appeared to be asleep, which would presumably have been the basis for counsel moving for a mistrial. ECF No. 1-1 at 29–30. Calleja has failed to show a mistrial motion would have been granted if counsel had

requested one. Counsel's strategy, to get the trial judge's attention by addressing the actions of the prosecutor, appears to have worked in that the trial judge became "more attentive" after counsel's comments. *Id.* Immediately after counsel gained the judge's attention by questioning the conduct of the prosecutor, the judge indicated that he had been "watching the witness and the jurors, not necessarily counsel." R. at 1386.

Aside from counsel's notes, the record contains no evidence that the trial judge was asleep. The trial transcript indicates that Calleja's counsel did not object on that basis, and further reflects the trial judge responded promptly to the objection actually made.

Further, decisions such as whether to move for a mistrial are "left to the sound judgment of counsel." *United States v. Chapman*, 593 F.3d 365, 370 (4th Cir. 2010) (holding the decision of whether to seek or forego a mistrial "remains counsel's to make even if the client expresses disagreement with the decision, and counsel's decision is not unreasonable simply because the client disagrees"). The Supreme Court of Virginia committed no error in concluding that counsel's failure to move for a mistrial did not constitute ineffective assistance.

### 6.   Ground 6—Failure to Negotiate or Amend Charge to a Misdemeanor

In ground 6, Calleja asserts his counsel was ineffective for failing to negotiate for the same plea deal Calleja received on related charges in the Circuit Court for Spotsylvania County, or for failing to move to amend the charges to a misdemeanor. ECF No. 1 at 13, 65; ECF 17 at 31.

Calleja raised this claim in his state habeas petition, and the Supreme Court of Virginia found he failed to satisfy either prong of the *Strickland* analysis, stating:

> Counsel could reasonably have determined the charging decision for another case in a different jurisdiction was utterly irrelevant to the selection of the appropriate charges to litigate in the present case, and any assertion that, but for counsel's alleged failure to rely on that charging decision, the felony charges would have been amended to misdemeanors is pure speculation.

Order at 19.

Calleja's letter to the trial judge prior to sentencing indicates that charges surrounding two stolen goats were prosecuted in Spotsylvania County. ECF No. 1-3 at 5. Calleja indicates those grand larceny charges were reduced to "receiving/buying stolen property." *Id.* In return for Calleja's plea, he received one year in jail with all but ten days suspended, which he was permitted to serve on weekends. *Id.*

The same letter indicates that, with regard to the charges at issue in this habeas petition, Calleja's counsel told him the Commonwealth "wouldn't be happy unless I did at least two [years]." *Id.* at 4, 6. The Commonwealth's position in this case effectively ruled out Calleja's receiving the same sentence he received in Spotsylvania County, or getting the charges reduced to a misdemeanor, which carries a maximum of one year in jail. *See* Va. Code Ann. § 18.2-11.

Calleja was charged with six felonies and faced potentially 90 years in prison. Order at 6 (citing Va. Code Ann. §§ 18.2-10, 18.2-91, 18.2-97, 18.2-108.01). Calleja has not shown counsel was ineffective in failing to negotiate a sentence of ten days to one year in prison in return for a guilty plea or in failing to persuade the Commonwealth to amend the charges to a misdemeanor.

Upon careful review of the transcript, and the state court record, the court concludes that, in reviewing grounds one through six, the Supreme Court of Virginia did not apply *Strickland* contrary to settled federal law, and did not make an unreasonable determination of the facts in applying the *Strickland* standard to the record in this case.

### III.     RECOMMENDATION

For the foregoing reasons, the Court **RECOMMENDS** that respondent's motion to dismiss, ECF No. 11, be **GRANTED**, and the petition for a writ of habeas corpus, ECF No. 1, be **DENIED** and **DISMISSED WITH PREJUDICE**.

## IV.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.     A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge

Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 30, 2020

31

## **Clerk's Mailing Certificate**

A copy of the foregoing was provided electronically to counsel for respondent and was

mailed this date to:

>Steven Paul Calleja, Jr., #1134939
>Haynesville Correctional Center
>P.O. Box 129
>Haynesville, VA 22472

Fernando Galindo, Clerk

By   /s/ J. L. Meyers
   Deputy Clerk

November  30  , 2020